*Alricks,* for respondent.

---

*Court of Common Pleas, Lebanon County, April* 23d, 1852.

## RANK ET AL. *v.* THE DAUPHIN AND SUSQUEHANNA COAL COMPANY.

When a person mortgages an imperfect title to real estate, and afterwards obtains a perfect one, that passes to his mortgagee.

Where land is sold for taxes, and a bond without a warrant of attorney to confess judgment payable in two years is given for the surplus over the amount of the tax and costs, the tax title is void. This bond is also defective when it describes the property as " a balance on unseated land sold as the property of O."

The assessment of taxes on land in the name of two different persons will not vitiate the sale, when the tax was not paid in the name of either.

Land may be sold for the unpaid taxes of a former year, although it had formerly been sold for those of a subsequent year, and the title of the purchaser at the latter sale would be good.

BY THE COURT.—The plaintiffs in this case have given in evidence a *prima facie* good title to the land in dispute. They would be entitled to recover it if there was nothing to gainsay or overturn their title.

They show an application made by William Stewart, Jr., for a warrant on the 7th of June, 1794, reciting a settlement made on 1st March, 1789; a warrant issued on the 18th of June, 1794; located by a survey on the 22d June, 1795; returned into the land office on the 10th of July of the same year; a deed from Stewart to James Wilson, dated May 11th, 1795; a judgment in the Circuit Court of the United States, against James Wilson's administrators, on the 14th of April, 1800; a sale of this tract by

[Rank et al. *v.* The Dauphin and Susquehanna Coal Company.]

the marshal in February, 1838; deed to the plaintiffs on the 20th of June, 1838; and patent obtained by them on the 26th of August, 1850.

No question has been raised in the case as to the regularity of any of these proceedings.

The defendants show that on the 3d of April, 1794, an application was made for one hundred warrants, the leading one being in the name of Joseph Heister; warrants issued the same day; payment of the purchase-money for the whole by James Wilson; a survey made by Bartram Galbraith on the twenty-seventh day of June, 1795, locating the warrant in this case, which is in the name of John Shaffer, and a return of that survey into the land office by Hollingsworth (a subsequent D. S. of the district, formerly filled by Galbraith), on the 9th of October, 1806. It is further shown that Judge Wilson, on the 5th of August, 1794, gave a mortgage, *inter alia*, of these hundred warrants to Wharton and others, furnishing and annexing a list of the warrants in various counties, and describing them as "*located or intended to be located.*" Also an article entered into between Judge Wilson and William Stewart, Jr., for the purchase of the land, on the 27th of December, 1794, and a certificate that the purchase-money was paid into the land office by Wilson for the William Stewart warrant on the —— day of ——, 179-, which contract appears to have been consummated by deed, as shown by the plaintiffs.

A scire facias issued on the mortgage given by Wilson, against his administrator, and judgment obtained on two nihils, in the year 1802; a levari on the judgment, sale of the whole property mortgaged, and sheriff's deeds to John Morton, on the 16th of January, 1803. Various conveyances were made of this land from time to time, until the title of the tract in dispute became vested in a Mr. Goddard, to whom a patent issued on the 23d of March, 1830. Numerous, or we might say rather innumerable, conveyances were made of this land from time to time; some of the deeds in trust and others for the use of the parties named, until the title became eventually vested in the Dauphin and Susquehanna Coal Company. These titles are not necessary for the elucidation of the legal questions in the case.

There can be no doubt that the William Stewart warrant is the better title; neither it nor the Shaffer warrant is descriptive.

The Shaffer warrant is the elder, but the Stewart warrant is first located. Besides, B. Galbraith, who made the survey under the Shaffer warrant, was out of his district, *in all probability*, and his survey was not turned into the land office till 1806, a period of eleven years after it was made. The failure to make a return may not be imputable to Mr. Galbraith; he may never have been paid his fees. But if surveyed by an officer out of his proper district, it would be invalid until returned and accepted; from

the great lapse of time before the return of this survey, it would be postponed, especially in favor of an elder survey made by the proper officer. But this John Shaffer warrant was mortgaged by Wilson on the 5th of August, 1794, and if his title was then imperfect and was afterwards perfected, the better and more perfect title will enure to the use of the mortgagee. There is no principle better settled in equity than where a man sells an imperfect title and afterwards obtains a perfect one, it will enure to the use of his vendee. The same doctrine is applied to mortgagor and mortgagee in Swinbourne *v.* Powel (2 Vern. p. 11; Crabb on Real Estate, 2 vol. pl. 2235; 9 Watts, 517), and the doctrine being consistent with fair dealing and common honesty, should be liberally extended.

At the time of giving the mortgage the title was imperfect, the warrant was not located, and although there was not so perfect a description of the land as would amount to notice to others, yet it is fair to presume that the owner understood where he intended to locate his warrant, and mortgaged that territory. When the location took place the mortgage attached to that spot, and when he contracted for the elder and better title of Stewart (which, it is conceded and agreed, covers precisely the same ground), the purchase enured to the use of the mortgagee. From the plaintiff's evidence, that title commenced by a settlement made in 1789, and by that the location was fixed independent of the survey, so that all the right to the Shaffer warrant as afterwards located, and all the rights of William Stewart, as evidenced by warrant, survey, and settlement, were secured to Wharton and others by their mortgage, which right vested long before the judgment under which the plaintiff's claim was obtained, and nearly six years before Wilson's death, when the lien of his general creditors commenced.

The rights of the creditors, therefore, did not intervene before the interest of the mortgagees had attached, and it matters not who *caused the Shaffer survey to be returned,* as the rights of the mortgagee attached to the territory surveyed under the warrant the moment it was made, and to all the other titles held by Wilson to that land; nor is it of the slightest importance in the present case, whether Galbraith was within or out of his district when he made the survey; whether he was on the land or not, or whether that title is valid or invalid, as it is conceded that the William Stewart title was good in 1795, and that it belonged to Wilson, and from what we have already stated, was bound by his mortgage. The sale under that mortgage, in 1803, vested the whole right of James Wilson to this land in the purchaser as fully as he held it by both titles; and when the sale was made by the marshal of the United States, in 1838, Wilson had nothing to sell, and the purchasers took nothing. This independent of the great length

of time between the obtaining of the judgment in 1800 and the sale in 1838. From the whole evidence in the case we are, therefore, of opinion that the defendant's title is good and valid, and the plaintiff's void. We are also of opinion that the act of Joseph Heister in entering a caveat and again withdrawing it, is of no importance in the case; there is no evidence that he had a shadow of title to this land at the time, but from aught that appears, it was an unauthorized interference on his part; his examination of the land by a surveyor in 1828 or 1829, is accounted for by his purchase in 1827, down to which time he does not appear to have had a shadow of title.

Thus far these contending claims were examined in 1840, when the title was before the Supreme Court; we are bound by that decision. Let us next examine the titles which have been acquired since.

In 1842, a tract of land, said to be the one in dispute, was regularly taxed in the name of Alexander Osborn & Co. The taxes amount to $8.42¾, and the land was sold, as appears from the deed, on the 18th day of August, 1844, by H. Carmony, treasurer, for the sum of $16.50, and purchased by Peter Rank, to whom a deed was made on the 9th day of January, 1845.

The taxes appear on the treasurer's sale-book to amount to $12.00¼, which from the place, and under the heading where we find it, seems to have been set down at that sum by the treasurer, *though the commissioners' clerk thinks it was done in the commissioners' office before it went into his hands.* It also appears that on a loose sheet, attached to the same book by wafers, the tax is set down as $12.63; which leaf the clerk thinks was also attached before the book went into the hands of the treasurer. Upon a careful examination it does not appear that this tract was taxed at all in the name of Alexander Osborn for the year 1843, either by the proper officers, the assessors, or by the commissioners, unless the increased tax from $8.43¾ to 12.00¼ or 12.63 can be so called; but there is nothing whatsoever which shows the increase to have been made on account of the taxes of 1843. The entry of $12.00¼ appears to us to be made by or for the treasurer, and merely connected with his sale, and not with any assessment; and the other sheet to have been made out in 1846, as a tax and sale list of that year, as it has in regular columns the taxes of 1842, '3, '4, and '5, entered on it, and the sales of 1846, all of which entries appear to have been made at the same time, with the same pen and ink; and the name of Alexander Osborn & Co., $12.63, *appears to have been added afterwards. Of these facts, however, you are the sole and proper judges.* They are unimportant so far as regards the validity of the plaintiff's tax title, but are important in relation to that of the defendant's, to which we will call your attention hereafter. Where any tax is regularly assessed and unpaid, the

officer has authority to sell. The taxes of 1842 appear to have been regularly assessed, and the only importance of the entry spoken of in the sale book of $12.00¼ is to show that the surplus bond was given for the right amount. If the tax was marked upon the treasurer's book, whether erroneously or otherwise, and the purchaser gave his bond for the surplus money apparently due, the sale is valid, notwithstanding the sum is wrong, and the bond given for too little. The surplus bond for $1.75 penalty, real debt 87½, is in evidence. This appears to be for the right sum, computing the taxes at $12.00¼, and the costs at $3.62½, but is in reality for 25 cents too much, as the legal costs are $3.87½. The error is corrected by an entry on the back of the bond, and is not one of which the real owner can complain if uncorrected.

A bond for the surplus money is decided to be necessary to the validity of the title, and that bond must be in a proper form. The deed and bond in the present case greatly vary from the form generally used, yet the deed, although informal, is good and sufficient to pass the title, if the bond is regular. This bond entirely deviates from those usually given, and does not conform to the act of Assembly. It is drawn payable two years after date, and does not contain a warrant of attorney to enter judgment.

By the 2d section of the act of 3d April, 1804, the sheriff or coroner (then authorized to make sales), is required " to take from the purchaser or purchasers bonds in his own name, *with warrants of attorney annexed,* for any surplus money that may remain after satisfying and paying the taxes and costs aforesaid, and the same bonds forthwith to file in the office of the prothonotary of the proper county;" and by the 4th section of the same act it is declared that the bonds so taken and filed " shall, from the date of the deed by him executed, bind as effectually, and in like manner as judgments, the land sold, into whosesoever hands the same may come, and the owners of said lands at the time of sale, or their heirs, etc., *may, at any time* within five years after such sale, cause actions to be entered upon the docket of the prothonotary in the name of the officer for the use of the owner, and if the money mentioned or contained in such bond, together with legal interest from the time it is demanded, be not paid within three months after such entry, execution shall forthwith issue, etc." The duty of taking these bonds is afterwards imposed on another officer, the treasurer, who makes the sale, but the form is in no wise changed. This act contemplated that the owner should have it in his power *at any time* after his property was sold to enter up the bond. He had a right to demand the money as soon as the bond was given, and it would bear interest from that time. He was not put to the delay and expense of a suit, but could at once have it entered as a judgment by virtue of the power of attorney.

Of both of these privileges he is deprived by the form of the

present bond; he cannot demand it for two years from the time of the sale. If demanded, it would not bear interest until due, and after the time of credit forced on him has expired, he has to bring suit for its recovery, instead of entering judgment and issuing an execution. A neglect to give a bond is the default of the purchaser; a neglect to have it drawn in proper form is, in several reported cases, declared to be attributable to him also, whilst a mistake of the treasurer as to the amount of taxes and costs due, or a neglect to file the bond, is imputable to the officer. If the deed itself showed that the taxes and costs would, together with the bond, fall greatly short of the amount bidden for the land, it always has been attributed to the party, and vitiated the sale.

This is a statutory bond and must substantially conform to the statute; in both particulars named, it violates it in a manner injurious to the owner of the land, and highly beneficial and convenient to the party giving it; he is relieved of its payment for two years, and cannot have a judgment entered against him in a summary way, and the money immediately collected. We are, therefore, of opinion that the bond is void. This bond being for a small amount, does not vary the principle; the same rule must be applied to it as if it had been given for the full value of the land; in many counties in the western part of the State, lands have sold for higher prices at treasurers', than at sheriffs' sales, as there is more confidence reposed in those titles than any others, and it is by no means uncommon for the owner to demand the bond as soon as the deed is acknowledged. It is often the best sale he can make, and he is not required by law to wait for the two years given for redemption to expire. He may, in the language of the act, *collect it at any time.* If the party and treasurer may, by blunder or contrivance, postpone the owner two years, they can ten. This being for the benefit and ease of the obligor, is presumed to be on his suggestion and request. In Sheerer's Assignee *v.* Lautzenhizer (6 W. 543), where but twenty days over one year was given to assignees under a voluntary assignment to sell the estate and distribute the money, the assignment was held to be void; it did not pursue the statute. The courts have shown great reluctance to *relieve* obligors from statutory bonds which did not conform to the law prescribing them, yet in many cases they have been held void; but here the party giving the obligation claims a benefit under it, asks to create an estate in himself by reason of it, and that another person shall be forced to take an obligation not drawn according to law. Certainly no court will oblige him to do it; although the obligee might sustain an action on this bond, and the obligor be obliged to pay it, yet the law will not force such an obligation upon him, or oblige him to bring a suit when the law says he shall have the

means of immediately entering judgment; nor will it oblige him to wait two years for his money without interest.

I have, in a practice of about thirty years, had occasion to examine several thousand tax sales, some in nearly every county in Western Pennsylvania, where those titles prevail to a greater extent than in any other part of the State, and never before saw a surplus bond without a warrant of attorney, or drawn payable at a future day.

Another objection is taken to this bond; that it does not sufficiently describe the property sold to enable it to be applied to the land in dispute.

In the treasurer's deed, the land is described as "situated in East Hanover township, in the county of Lebanon, surveyed to Alexander Osborn & Co., containing 441 acres;" in the bond it is described as "a balance on unseated land sold as the property of Alexander Osborn & Co.;" no further description is given, neither township nor number of acres. The deed recites the sale to have been made on the 18th day of August; this bond is dated on the 12th. The bond shows a surplus money of 87½ cents, or probably in connection with the indorsement, 62½ cents; the tax recited in the deed amounts to $8.42¾, which with the costs, $3.87½, would make $12.30¼; the bond should, therefore, have been given for $3.19¾ instead of 62½ or 87½ cents. We have already said that the variance in the amount being a mistake of the treasurer, as appears from his books, would not vitiate the sale, but where the description is loose, as in the present case, it tends to increase the difficulty of applying the bond to the sale of this tract, or making the lien thereon certain. Both the deed and bond are required by law to be entered in the prothonotary's office, the one in short after the manner of sheriffs' deeds, the other to be filed; by comparing the two together, a subsequent purchaser of the land can tell on what property the bond is a lien, which continues for five years. The variance between the date of the sale as stated in the deed, tends to increase the difficulty. We therefore consider it very questionable whether the description in this bond is sufficient to render it valid, and as the cause will go into the Supreme Court on other points, we declare that it is void for want of a proper description.

There is more in this case than in Bartholemew *v.* Leech (7 W. 471), where all description of the land was omitted; but in one particular there is less, as that bond was for the sum of money corresponding with the surplus stated in the deed. Yet that bond was held void, and the chief justice, in delivering the opinion, declares that the purchaser is bound to know the law of his title, and point out errors to the treasurer in the concoction of it. That the bond is drawn under the direction of the purchaser. The description is not so full as in Devor *v.* McClintock (9 W.

& S. 80). That bond was "conditioned to pay the surplus money arising from the sale of a tract of unseated land to the said John McClintock, situate in Rye township, in the county of Perry, containing twenty acres," which was declared to be conveniently certain; in this bond we have neither the township nor number of acres, besides the variances in the amount and dates of the sale and bond. From the dates it appears that this bond was given six days before the sale of the land to which it is proposed to apply it, and although there may possibly be a mistake in the deed, yet that mistake nowhere appears of record.

Another objection is also raised to this sale. The defendants say that they filed a description of their land in the commissioners' office, as required by the act of 1806; that the same was taxed regularly in their warrantee name for each and all the years when it was taxed to Alexander Osborn & Co.; that there was nothing in the office to connect Alexander Osborn & Co. with this land, and the number of acres (441) was calculated to mislead them; that they could not suppose the land was doubly taxed in the name of Shaffer and that of Osborn. If they had shown that they had paid the taxes in the name of Shaffer, that would have been sufficient to discharge the territory assessed, it matters not in whose name; but as it is not pretended that they paid the taxes, the assessment in both names will not vitiate it. If Osborn was so connected with this tract as to enable the jury to identify it as the one in dispute, it matters not whether his title was good or bad, whether he had filed a description in the office or not; the act of Assembly declares that the sale shall vest in the purchaser all the estate and interest of the real owner in the land, whether taxed and sold in his name or otherwise. Here this case might be rested; as we have already decided the plaintiffs' original title is overturned by that of the defendants, and that their treasurer's deed is void and confers no right. Although the plaintiffs must recover on the strength of their own title, yet the defendants have asked us to express an opinion on the tax title which they have given in evidence; and to enable the cause to be reviewed on every point, we shall decide upon its validity. This tract was assessed in the name of John Shaffer for the taxes of 1842, '43, '44, and '45, and sold by the treasurer of Lebanon county to Presley Blakiston in the year 1846. It is conceded that sale is regular in every particular, except a small error committed by the treasurer in taxing his cost, which we have already declared does not vitiate, as settled in Gibson *v.* Robbins (9 W. 156). But the taxes of 1842 were paid by the sale of Peter Rank in 1844, as his deed shows the sale to have been for the taxes of that year, and those of 1844 and 1845 were paid by the plaintiffs; the only unpaid assessment was that of 1843. There is nothing in the assessments, sale-book, or elsewhere, which shows that any portion of the taxes

[Rank et al. *v.* The Dauphin and Susquehanna Coal Company.]

of 1843 was paid, nor is there any reason to believe or suppose that the increase from $8.42¾ to $12.00¼ was on account of the taxes of that year.    It contradicts the sum in the treasurer's deed, and may have been a mistake of the treasurer in setting down the sum on his list, in making the sale to Rank.    It may as well be treated as part of the taxes of 1841, or 1844, as of 1843; and if the taxes of the latter year could have embraced but a portion of them, the valuation shows that the taxes must have amounted to a greater sum.    The taxes of 1843 were, therefore, unpaid, and we have already decided that where any part of the taxes are regularly assessed and due, the sale is authorized.

But it is contended that the sale of the plaintiffs, in 1844, divested the county of all claim for the taxes of 1843.    If the county officers choose to make a sale of the land, they cannot afterwards claim to have a lien existing on the same premises.

As a general rule, it is entirely true, that if an *individual* sells his property, he discharges all liens against it, but it may well be questioned whether that rule applies to public officers acting for the county.    It has been repeatedly decided that a mistake or neglect of duty by a State officer shall not prejudice the commonwealth.    Why should it injure a county?    The owner has neglected to pay his taxes; the purchaser of 1844 has also failed to pay them; they have not gone into the county treasury from any source, and it may well be asked, why shall they not be collected?

By law, no sale can be made for road taxes until one year after the return and filing of the transcript by the supervisors in the commissioners' office, which very frequently is neglected at the proper time.    There is often a failure to return the transcript of school taxes, so that the money may be collected at the biennial sales.    Those taxes are carried forward against the land in succeeding years, yet are kept distinct on the commissioners' books. I have known sales made frequently for those taxes at an after period, and am not prepared to say that these sales are irregular and void.    If even the road tax is due, there is power to sell.    We therefore declare the defendant's deed good and valid.    On the same principle it might be urged that the land could not afterwards be sold for the taxes of 1844, if the same had been neglected by the purchaser of that year.    They were assessed in December, 1843, and were a lien in August, 1844.    Yet in every part of the State sales are so made as often as the delinquency occurs.

AFFIRMED BY THE SUPREME COURT, July 25th, 1853.    Not reported.

*Porter, Reynolds, and Weidman, for plaintiff.*

*Fisher, for defendant.*